EDWARD R. REINES (Bar No. 135960)
edward.reines@weil.com
DEREK C. WALTER (Bar No. 246322)
derek.walter@weil.com
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

*Attorneys for Defendant and Counter-Plaintiff*
BIO-RAD LABORATORIES, INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| CHROMACODE, INC.,<br><br>Plaintiff and Counter-Defendant,<br><br>vs.<br><br>BIO-RAD LABORATORIES, INC.,<br><br>Defendant and Counter-Plaintiff. | Case No.: 5:23-cv-04823-EJD<br><br>**BIO-RAD LABORATORIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Date:  August 28, 2024<br>Time:  10:00 a.m.<br>Department:  Courtroom 4 – 5th Floor<br><br>Judge:  Hon. Edward J. Davila |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION................................................................................................. 1

II.   BACKGROUND................................................................................................. 1

      A.    The '128 Patent ....................................................................................... 2

      B.    The '154 Patent ....................................................................................... 3

III.  THE PROPER CONSTRUCTION OF THE DISPUTED TERMS.................................. 5

      A.    Disputed Terms in the '128 Patent........................................................... 5

            1.    "average level[s]" and "levels" ..................................................... 5

            2.    "digital amplification assay" .......................................................... 8

                  a.    The term "digital amplification assay" is not limiting ................... 8

                  b.    Even if the preamble is deemed limiting, ChromaCode's
                        construction should be rejected ....................................................... 9

            3.    "each type of the more than R targets"........................................... 10

                  a.    ChromaCode has waived any indefiniteness argument................ 10

                  b.    The term is not indefinite because a POSA can ascertain the
                        scope of the claim........................................................................... 12

            4.    "the more than R targets include three targets"......................................... 13

            5.    "calculating" / "calculated" .......................................................... 14

      B.    Disputed Terms in the '154 Patent........................................................... 15

            1.    Whether the "plotting" and "determining" steps must be performed
                  in the order written ................................................................................ 15

            2.    "generally parallel" ...................................................................... 17

            3.    "a different plurality of the partitions contains each different pair of
                  the R targets".......................................................................................... 20

      C.    Disputed Terms in both the '128 and '154 Patents ............................................. 22

            1.    "target[s]"............................................................................................ 22

            2.    "each [of]" ........................................................................................... 24

IV.    CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003) ..................................................................................................15

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003) ..................................................................................................18

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008) ..................................................................................................15

*Baxalta Inc. v. Genentech, Inc.*,
   972 F.3d 1341 (Fed. Cir. 2020) ....................................................................................................7

*Comaper Corp. v. Antec, Inc.*,
   596 F.3d 1343 (Fed. Cir. 2010) ....................................................................................................5

*Finjan, Inc. v. Proofpoint, Inc.*,
   No. 13-cv-05808-HSG, 2015 WL 9460295 (N.D. Cal. Dec. 23, 2015) ...................................11

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ..................................................................................................14

*Illumina Inc. v. BGI Genomics Co., Ltd.*,
   No. 20-cv-01465-WHO, 2020 WL 6891818 (N.D. Cal. Nov. 24, 2020) ..................................11

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
   29 F.4th 1376 (Fed. Cir. 2022) ....................................................................................................7

*MasterObjects, Inc. v. Meta Platforms, Inc.*,
   No. 2023-1097, 2024 WL 630330 (Fed. Cir. Feb. 15, 2024) .........................................6, 10, 23

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
   467 F.3d 1355 (Fed. Cir. 2006) ..................................................................................................11

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ....................................................................................................7

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................................1, 10, 22

*Power-One, Inc. v. Artesyn Techs., Inc.*,
   599 F.3d 1343 (Fed. Cir. 2010) ..................................................................................................24

*Resh, Inc. v. Robert Conrad, Inc.*,
   No. 5:22-CV-01427-EJD, 2023 WL 8482869 (N.D. Cal. Dec. 7, 2023) ..................................18

*Sequoia Tech., LLC v. Dell, Inc.*,
   66 F.4th 1317 (Fed. Cir. 2023) ........................................................................................... 7

*Silicon Labs., Inc. v. Cresta Tech. Corp.*,
   No 14-cv-3227-PSG, 2016 WL 791792 (N.D. Cal. Mar. 1, 2016) ......................................... 11

*Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*,
   844 F.3d 1370 (Fed. Cir. 2017) ......................................................................................... 18

*Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*,
   753 F.3d 1291 (Fed. Cir. 2014) ......................................................................................... 22

*Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*,
   32 F.4th 1161 (Fed. Cir. 2022) ......................................................................................... 16

*Taction Technlogy, Inc. v. Apple Inc.*,
   No. 21-CV-812 TWR (JLB), 2022 WL 18781398 (S.D. Cal. Sept. 28, 2022) ........................ 18

*Tech. Licensing Corp. v. Blackmagic Design Pty Ltd.*,
   No. C 13-05184 SBA, 2016 WL 8902602 (N.D. Cal. Nov. 23, 2016) ..................................... 7

*Thorner v. Sony Computer Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ........................................................................................... 6

*TomTom, Inc. v. Adolph*,
   790 F.3d 1315 (Fed. Cir. 2015) ...................................................................................... 8, 9

*United Access Techs., LLC v. AT & T Corp.*,
   757 Fed. Appx. 960 (Fed. Cir. 2019) ....................................................................... 13, 14, 19

**Statutes**

35 U.S.C. § 112(2) ........................................................................................................... 10

**Rules**

Patent Local Rule 3-3(d) ...................................................................................................... 10

Patent Local Rule 3-6 .......................................................................................................... 11

Patent Local Rule 4-5(a) ........................................................................................................ 1

Pursuant to Patent L.R. 4-5(a), Defendant/Counterclaim-Plaintiff Bio-Rad Laboratories, Inc. ("Bio-Rad") submits this Opening Claim Construction Brief on the proper construction of disputed claim terms of U.S. Patent Nos. 9,222,128 (the "'128 Patent") and 9,921,154 (the "'154 Patent") (collectively the "Asserted Patents").

## I.  INTRODUCTION

The proper scope of a patent claim must be grounded in an understanding of "what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).  ChromaCode repeatedly ignores this principle and instead transparently tries to shape the claim language to its own ends.  ChromaCode's claim constructions are supported by neither the patent claims themselves nor any other aspect of the intrinsic evidence. Many of ChromaCode's constructions look to read limitations into the claims from the specifications, contradicting well-established claim construction doctrine.  Other of ChromaCode's constructions introduce limitations that are not at all discussed in the specifications.  In other instances, ChromaCode attempts to challenge the validity of the Asserted Patents on indefiniteness grounds but does not provide any evidence, much less clear and convincing evidence.  For these and other reasons, ChromaCode's proposed constructions should be rejected.

## II.  BACKGROUND

DNA is an informational molecule that has the genetic information about a cell.  Certain errors in the sequence of a DNA molecule can be clinically relevant, as an abnormal sequence can act as marker for diseases such as cancer.  Therefore, methods to interrogate and analyze such sequences are of great interest.  One such method is PCR amplification.

PCR amplification permits one to obtain many copies of a DNA sequence of interest through a series of repeated denaturation and amplification cycles.  An overview of PCR is presented in many short videos that are readily located on the Internet.  *See, e.g.*, https://www.youtube.com/watch?v=a5jmdh9AnS4.  The PCR process can be used to label a sequence of interest to detect it.  To accomplish this, a probe can be designed that binds to the sequence of interest and that has both a color and a quencher (which suppresses the color).  After allowing both the probe and primer to bind to the sample molecule, the PCR process breaks apart

the probe, freeing the color and allowing it to be read.   This process is also summarized in many short Internet videos.   *See, e.g.*, https://www.youtube.com/watch?v=Z62Ec-t6IeU.

The '128 and '154 Patents are directed to solving problems that arise with multiplexing PCR assays, or attempting to detect more than one target simultaneously.  The claimed methods solve these problems by using multiple colors in combination to encode targets of interest.  Included among the many embodiments of these patents are Bio-Rad's droplet digital PCR products, where Bio-Rad has been a pioneer for over a decade, having brought the first such product of its type to market.  Using Bio-Rad's droplet digital PCR products, researchers have been able to rapidly detect biological targets with an enhanced level of sensitivity and quantitative accuracy.  *See e.g.*, https://www.youtube.com/watch?v=Qwma-1Ek-Y4.

### A.    The '128 Patent

The '128 Patent is entitled "Multiplexed Digital Assays with Combinatorial Use of Signals" and issued on December 29, 2015, claiming priority to a March 2011 provisional.  Prior art methods for PCR multiplexing were inadequate for many reasons, including that the hardware required to detect multiple targets was complex and costly.  As the '128 Patent explains, "instruments with more detection channels, to detect more colors, are more expensive than those with fewer detection channels," '128 Patent at 2:14-16, and "increasing the number of distinguishable dyes is expensive and becomes impractical beyond a certain number."  *Id.* at 2:16-18.

The '128 Patent provides a solution by allowing targets to be detected by more than one color signal.  In an example embodiment, the '128 Patent teaches that three targets may be detected using just two signals:



*Id.*, Fig. 8; *see also id.* at 12:1-30.  As shown in Figure 8, three targets are detectable using only two signals, "Signal α" and "Signal β," with Target 1 being represented by "Signal α," Target 2 being

represented by "Signal β," and Target 3 being represented by "Signal α" and "Signal β."  Thus, "Signal α" represents Targets 1 and 3 and "Signal β" represents Targets 2 and 3.

In a further application, the '128 Patent teaches distinguishing targets by using different signal intensities to represent more than one target:



Fig. 22

*Id.*, Figure 22; *see also id.* at 4:17-23, 25:58-26:7.  As shown in Figure 22, Target 1 is detected in a so-called "FAM Intensity," which is the intensity of the light that is emitted from a probe called "FAM."  Similarly, Target 2 is detected in a "VIC Intensity" or color, and Target 3 is detected in both the "FAM Intensity" and the "VIC Intensity."  As such, the "FAM" color represents Targets 1 and 3 and the "VIC" color represents Targets 2 and 3.

**B.     The '154 Patent**

The '154 Patent is entitled "Multiplexed Digital Assays" and, like the '128 Patent, relates to techniques for simultaneously detecting multiple biological targets in a sample molecule.  *See, e.g.*, '154 Patent at 2:26-28.  The '154 Patent issued on March 20, 2018 and also claims priority to a March 2011 provisional.  The '154 Patent addresses the same shortcomings of previous assays for simultaneously detecting multiple targets as described in Section II.A.  The disclosure teaches assays for detecting a greater number of targets than optical channels (*i.e.*, signal colors) that are used in an assay, and the detection of the targets is performed simultaneously using the same optical channel.  *See, e.g.*, *id*. at 4:51-60.

For example, the '154 Patent teaches examples wherein two targets are detected using a *single* detection color:



*Id.*, Figure 5; *see also id.* at 15:36-16:34.  As shown in Figure 5, two targets, "RPP30" and "C61," are detected using a single color channel (*i.e.*, the "FAM" channel).  The presence of the two targets is differentiated by differing intensities:

- When both targets are absent, the intensity is lowest and is close to zero.
- When only the C61 target is present, the intensity is roughly 3.
- When only the RPP30 target is present, the intensity is roughly 10.
- And, when both targets are present, the intensity is roughly 13.

*See id.* at 15:35-64.

The '154 Patent further teaches that selected embodiments "may be extended in various ways," *id.* at 5:19, including by, for example, using more than one detection color in an assay.  *See id.* at 5:23-31.  For instance, the '154 Patent teaches differentiating three targets using two colors:



*Id.*, Figure 12; *see also id.* at 20:7-44.  As shown in Figure 12, three targets "RPP30," "13q3," and "10q1" are detected in two colors: "Channel 1," a "FAM" channel, and "Channel 2," a "VIC" channel.  The targets are differentiated when the signals are present both alone and in combination.

The '154 Patent teaches yet more embodiments that involve detecting four targets in two colors by applying the same teachings:



Fig. 16

*Id.*, Figure 16; *see also id.* at 21:13-58.  As shown in Figure 16, four targets "RPP30," "MP10K," "13q3," and "10q1" are detected in two channels or colors: "Channel 1," a "FAM" channel, and "Channel 2," a "VIC" channel.  The targets are differentiated when present both alone and in combination.

## III.    THE PROPER CONSTRUCTION OF THE DISPUTED TERMS

### A.    Disputed Terms in the '128 Patent

#### 1.    "average level[s]" and "levels"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "average level[s]" ('128 claims 1, 8-9)<br><br>"levels" ('128 claim 12) | "statistical measure of frequency"<br><br>Alternatively, if "average level" and "level[s]" are construed to have different meanings, then "level[s]" should be construed as "measure of frequency" | Plain and ordinary meaning for both terms |

ChromaCode attempts to construe two separate terms, "average level[s]" and "levels," to have the same meaning.  ChromaCode's constructions, however, ignore the rule "that two different terms used in a patent have different meanings."  *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (finding the terms "drive bay" and "drive bay slot" to have different meanings).  Indeed, ChromaCode's alternative construction shows that it understands the terms are different.  Notwithstanding the attempt to give two terms the same meaning, both of ChromaCode's constructions should be rejected because they are unsupported by the intrinsic record.

"The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full

scope." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). "Absent lexicography or disavowal, we do not depart from the plain meaning of the claims." *MasterObjects, Inc. v. Meta Platforms, Inc.*, No. 2023-1097, 2024 WL 630330, at *5 (Fed. Cir. Feb. 15, 2024) (internal quotation and citation omitted). Here, there is no lexicography for the disputed term. In fact, the phrase "statistical measurement" in ChromaCode's construction appears nowhere in the patent specification.

There is also no disavowal to justify limiting "level" to "frequency." While "frequency" can be a form of "level," it is not the only form, a point the specification confirms. Specifically, the '128 specification, in describing Figure 4, states:

> Each target is present here at an average level (or frequency) of about 0.2 in the droplets. In other words, each target is amplified and detected on average about once every five droplets. Accordingly, the expected frequency of droplets containing both targets is the product of the two droplet frequencies, or about 0.04 (1 out of every 25 droplets).

'128 Patent at 10:56-61. Here, the specification discusses the frequency at which a droplet may contain a specific target. *See also id.*, Figure 4 (showing that for every 20 droplets, target 1 is present in 4 droplets—the frequency is 4/20=0.2; same for target 2). But then, the specification goes on to repeatedly describe other embodiments using the inventive assays to measure the "concentration" of the target:

> A level of each target may be calculated, indicated at 52. The level may be ***an average level, such as an average concentration*** of molecules of the target per partition.

*See, e.g.*, *id.* at 6:52-54, 7:63-65, 8:51-53.[1]

As the foregoing passage establishes, "concentration" is another form of "level" that is different from "frequency." *See id.* at 12:21-27. ChromaCode's construction, however, is limited to a single embodiment—"frequency"—and excludes others—*e.g.*, "concentration." Nowhere in the intrinsic record did the patentee disavow any of these embodiments. ChromaCode's construction, if adopted, would exclude from the claims multiple preferred embodiments for no good reason, a result that is highly disfavored. *See Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317,

---

[1] Emphasis supplied unless otherwise noted.

1327 (Fed. Cir. 2023) ("a claim construction excluding a preferred embodiment is rarely, if ever correct") (cleaned up).

Further, claim 8 of the '128 Patent recites the "method of claim 1, wherein the average level is a concentration." '128 Patent, Cl. 8. ChromaCode's construction, which recites only "frequency" and excludes "concentration," would render this dependent claim meaningless. This confirms that ChromaCode's construction cannot be adopted. *See Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well."); *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1346 (Fed. Cir. 2020) ("The district court's construction [of the independent claim] which excludes these explicitly claimed embodiments [in the dependent claims] is inconsistent with the plain language of the claims.").

Notably, ChromaCode does not contend that the term "level" in Bio-Rad's '154 Patent—which is used in the '154 Patent claims in a very similar manner—needs further construction. "As a general rule, courts presume that terms used across related patents share a common meaning." *Tech. Licensing Corp. v. Blackmagic Design Pty Ltd.*, No. C 13-05184 SBA, 2016 WL 8902602, at *4 (N.D. Cal. Nov. 23, 2016) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003)). There is no compelling reason why the same term should be construed differently in the '128 and '154 claims. Indeed, the '154 specification discloses:

> Each [target] level may, for example, be a value representing the total number of partitions positive for the target, or a concentration value, such as a value representing the average number copies of the target per partition. … A level (e.g., concentration) of each target may be determined with Poisson statistics. The concentration may be expressed with respect to the partitions and/or with respect to a sample providing the target.

'154 Patent at 10:61-11:6. This disclosure confirms the plain and ordinary meaning of "level"—which is not limited to "frequency."

### 2.    "digital amplification assay"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "digital amplification assay" ('128 claims 1, 12) | Limiting; "an assay in which a sample is separated into partitions containing zero or small numbers of individual molecules; the molecules are then amplified; and digital information on the presence or absence of individual molecules within each partition is collected and consolidated across the partitions" | Not limiting; to the extent a construction is deemed necessary, "an assay in which targets from a sample are partitioned and amplified, and digital information on the presence or absence of said targets is collected" |

The parties dispute whether "digital amplification assay" in the preamble is limiting (ChromaCode) or not (Bio-Rad).  Further, to the extent the term is found limiting, the parties dispute whether it should be construed with the additional limitations asserted by ChromaCode: "an assay in which a sample is separated into partitions containing zero or small numbers of individual molecules; the molecules are then amplified; and digital information on the presence or absence of individual molecules within each partition is collected and consolidated across the partitions."  ChromaCode's construction should be rejected as it incorporates unwarranted limitations to the preamble.

### a.    The term "digital amplification assay" is not limiting

A "preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) (internal quotation and citation omitted).  The parties do not dispute that "digital amplification assay" comprises partitioning a sample, amplifying the targets in the partitions, and colleting digital information on the presence or absence of the targets.[2]  These steps are already fully laid out in the '128 claims:

> A method of performing a multiplexed digital amplification assay,
> [] comprising:
>
> *amplifying* more than R *targets in partitions*;

---

[2] To the extent that ChromaCode contends "digital amplification assay" is directed to "individual molecules" as opposed to "targets," this dispute is addressed in the construction of "target[s]." *See infra* Section III.C.1.

> ***creating* R *signals*** representative of light detected in R different wavelength regimes from the partitions, where R≧2; and
>
> ***calculating an average level*** of each target in the partitions based on the R signals, wherein the level calculated accounts for a coincidence of all possible combinations of the more than R targets in the same individual partitions ….

'128 Patent, Cl. 1.  Because the body of the '128 claims already defines a structurally complete invention and the preamble merely states the intended use for the claimed invention, the preamble should be not limiting.   Indeed, where, as here, "the preamble is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim [, the Court should] not construe it to be a separate limitation."  *TomTom*, 790 F.3d at 1324 (internal quotation and citation omitted).  Hence, "digital amplification assay" should not be construed to be limiting.

### b.    Even if the preamble is deemed limiting, ChromaCode's construction should be rejected

Even if the preamble is deemed limiting, ChromaCode's construction should still be rejected because it attempts to introduce additional limitations, such as "partitions containing zero or small numbers of individual molecules" and "digital information [is] consolidated across the partitions" into the claims.  No intrinsic evidence supports this.  Just the opposite, the intrinsic record undermines ChromaCode's construction.

For example, the '128 specification states that a "fraction of the partitions may have a coincidence of different targets, where each of these partitions contains a copy of each of ***two or more targets*** in the same individual partitions."  '128 Patent at 8:10-13.  Nowhere does the specification limit the number of targets in the same individual partitions to be zero or small as proposed by ChromaCode.  Instead, the specification states that "the fraction of partitions containing two or more distinct targets may ***(or may not) be kept relatively low***."  *Id.* at 8:18-19; *see also id.* at 8:10-30.  A POSA would hence understand that the number of molecules in an individual partition does not have to be "zero or small."

ChromaCode seeks to introduce these limitations into the claims because it seemingly contends that the claims should be limited to digital PCR.  *See* Dkt. No. 51 at 3 ("No discussion of real-time (or quantitative) PCR in the patent or its prosecution history. All discussion and examples

of assays in the specification and prosecution history are of digital assays."). The '128 Patent, however, is not limited to digital PCR, as confirmed in the specification:

> In some embodiments, preparation of the sample may include combining the sample with reagents for amplification and for reporting whether or not amplification occurred. ***Such reagents may include any combination*** of primers for the targets (e.g., a forward primer and a reverse primer for each target), reporters (e.g., probes) for detecting amplification of the targets, dNTPs and/or NTPs, at least one enzyme (e.g., a polymerase, a ligase, a reverse transcriptase, or a combination thereof, each of which may or may not be heat-stable), or the like.

'128 Patent at 5:24-33. A POSA would understand from this disclosure that the invented methods can be broadly directed to many sample amplification methods, including digital PCR as well as other methods (*e.g.*, quantitative PCR). ChromaCode's construction, which is apparently limited to digital PCR, should thus be rejected. Even assuming the '128 Patent treats digital PCR as the preferred embodiment, the Court should "avoid importing limitations from the specification into the claims." *MasterObjects*, 2024 WL 630330, at *6 ("And even when a patent only describes a single embodiment, the claims are not necessarily construed as being limited to that embodiment.") (quoting *Phillips*, 415 F.3d at 1323).

### 3.    "each type of the more than R targets"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "each type of the more than R targets" ('128 claim 9) | Indefinite | Plain and ordinary meaning |

#### a.    ChromaCode has waived any indefiniteness argument

The Court should strike ChromaCode's contention that "each type of the more than R targets" is indefinite because ChromaCode did not disclose this argument in its invalidity contentions pursuant to the Local Patent Rules. Patent L.R. 3-3(d) requires ChromaCode to disclose any "grounds of invalidity" that are based on "indefiniteness under 35 U.S.C. § 112(2)." ChromaCode failed to meet the requirement and should not be allowed to seek to invalidate a claim at claim construction on a theory it did not raise in its invalidity contentions.

ChromaCode served its invalidity contentions on February 5, 2024 and amended them on February 29, 2024. It is undisputed that ChromaCode did not raise any indefiniteness challenge based on the term "each type of the more than R targets" in either set of contentions. *See* Ex. 1 at

10-13; *see also* Ex. 2 at 9-12. If ChromaCode wanted to add this challenge to its invalidity contentions, it could do so only "by order of the Court upon a timely showing of good cause." Patent L.R. 3-6. Yet, ChromaCode never tried to do so. ChromaCode disclosed its indefiniteness position only in preparation for the joint claim construction statement. Even worse, as shown by the statement, ChromaCode utterly failed to lay out any basis for its challenge. *See* Dkt. No. 51 at 9 (ChromaCode's support for its challenge is the claim itself and nothing else).

Courts in this District have stricken untimely challenges under similar circumstances. *See, e.g.*, *Illumina Inc. v. BGI Genomics Co., Ltd.*, No. 20-cv-01465-WHO, 2020 WL 6891818, at *7-8 (N.D. Cal. Nov. 24, 2020) (striking an indefiniteness challenge because Defendant "has not made a showing of 'good cause' to amend its invalidity contentions, and did not disclose this indefiniteness challenge"); *Silicon Labs., Inc. v. Cresta Tech. Corp.*, No 14-cv-3227-PSG, 2016 WL 791792, at *3 (N.D. Cal. Mar. 1, 2016) (finding indefiniteness challenges were waived and stating "the disclosure requirements of this district's patent local rules are not optional, and the failure to consistently and clearly articulate a party's invalidity challenges without justification at each demarcated step dooms any effort to revive them later in the case"); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 WL 9460295, at *3-4 (N.D. Cal. Dec. 23, 2015) (striking indefiniteness arguments not disclosed in invalidity contentions).

ChromaCode's failure to follow the Local Patent Rules is highly prejudicial to Bio-Rad. The challenged patents are presumed valid. ChromaCode bears the burden to prove indefiniteness by clear and convincing evidence. By disclosing this term for the first time at claim construction while failing to provide any basis supporting its arguments for indefiniteness, ChromaCode prejudices Bio-Rad by unfairly shifting the burden to Bio-Rad to guess its theory of invalidity and prove validity.

To allow ChromaCode to introduce new indefiniteness theories at claim construction would subvert the purpose of the Patent Local Rules, which is to "require parties to crystallize their theories of the case early in the litigation so as to prevent the shifting sands approach to claim construction." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (internal quotation omitted). It is manifestly unfair for ChromaCode to hide its indefiniteness theory while

Bio-Rad is required to serve an opening brief to address the unknown argument that ChromaCode failed to disclose in its invalidity contentions.

For these reasons, ChromaCode's indefiniteness challenge based on "each type of the more than R targets" should be struck.

### b. The term is not indefinite because a POSA can ascertain the scope of the claim

Even to the extent the Court permits ChromaCode's belated challenge, it should be rejected on the merits because a POSA can understand with reasonable certainty the meaning of "each type of the more than R targets." Again, while ChromaCode bears the burden of proving indefiniteness by clear and convincing evidence, it provides no intrinsic support nor any expert testimony to support its assertion that the term is indefinite. *See* Dkt. No. 51 at 8.

Turning to the claim language, claim 9 of the '128 Patent recites:

> The method of claim 1, wherein the step of calculating an average level includes a step of determining a total number of amplification-positive partitions for each type of the more than R targets and a step of determining a total number of partitions.

'128 Patent, Cl. 9. The claim recites a step of calculating the target levels, including determining a total number of amplification-positive partitions for each type of the targets and determining a total number of partitions. The '128 specification thus provides embodiments that instruct a POSA on the scope of the claim, particularly the bounds of the disputed term "each type of the more than R targets."

Specifically, the specification describes calculating levels of targets, *e.g.* Target 1 and Target 2 in Figures 6–8, based on "the number of each type of single-positive droplet" and "the total number of droplets:"

> The single-positive signatures indicated at 160 and 162 unambiguously identify corresponding droplets 118, 120 as containing at least one copy of Target 1 or Target 2, respectively, and no copy of Target 3. Accordingly, ***the number of each type of single-positive droplet*** may be used, in a ratio with ***the total number of droplets***, to calculate an average level of Target 1 and of Target 2.

'128 Patent 12:10-16. A POSA would understand that here, each ***type*** of a target directly corresponds to the target itself because the "single-positive signatures [] unambiguously identify" droplets having the specific target. *Id*.

Therefore, the disputed term is not indefinite and should be construed with its plain and ordinary meaning.

### 4.    "the more than R targets include three targets"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "the more than R targets include three targets" ('128 claim 1) | Indefinite | Plain and ordinary meaning |

"Claims are invalid for indefiniteness if, when viewed in light of the specification and the prosecution history, they fail to inform, with reasonably certainty, those skilled in the art about the scope of the invention." *United Access Techs., LLC v. AT & T Corp.*, 757 Fed. Appx. 960, 969 (Fed. Cir. 2019) (internal quotation and citation omitted).

ChromaCode has the burden of proving indefiniteness by clear and convincing evidence. *See id.* Yet, it provides no intrinsic support nor any expert testimony to support its assertions that the term is indefinite. *See* Dkt. No. 51 at 8. Rather, in its invalidity contentions, ChromaCode vaguely alleges that "the more than R targets include three targets" is indefinite because a POSA "could not determine the bounds of the" limitation. Ex. 1 at 11; Ex. 2 at 10.

A POSA, however, can indeed ascertain the bounds of the term with reasonable certainty. Claim 1 of the '128 Patent recites, *inter alia*:

> A method of performing a multiplexed digital amplification assay, [] comprising:
>
> amplifying more than R targets in partitions;
>
> creating R signals representative of light detected in R different wavelength regimes from the partitions, where R≧2; and
>
> calculating an average level of each target in the partitions based on the R signals …;
>
> wherein the more than R targets include three targets, and wherein the average levels of the three targets are calculated based on light detected from only two fluorophores associated with probes that bind to amplicons of the three targets during amplification.

'128 Patent, Cl. 1. Specifically, the claim sets forth that among the more than R targets, the average levels of *three* targets are calculated based on light signals detected from only two associated fluorophores.

Thus, a POSA would understand that the language "more than R targets include three targets" sets the lower limit of the number of targets, which is three. There is no uncertainty about the scope of the limitation—even when the term does not have an upper limit. *See United Access*, 757 Fed. App.x at 970 ("The fact that the upper limit of the term [] is not defined, however, does not render the term indefinite."); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1253 n.5 (Fed. Cir. 2008) ("Of course, a claim may contain a limitation that includes no explicit upper bound at all [].").

### 5. "calculating" / "calculated"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "calculating" / "calculated" ('128 claims 1, 4, 9, 12) | "estimating" / "estimated" | The term "calculating" is interchangeable with "estimating" and vice versa |

The parties dispute whether the jury should be instructed that "calculation" must mean "estimation" (ChromaCode) or whether the jury should be instructed that "calculation" and "estimation" are interchangeable (Bio-Rad). Bio-Rad's construction should be adopted because the specification unambiguously uses the two terms interchangeably.

The '128 specification expressly says that the two terms are interchangeable. *See* '128 Patent at 6:54-55 ("The terms 'estimation' and 'calculation' are used interchangeably."). The '128 specification elsewhere uses the two terms interchangeably. *See, e.g.*, *id.* at 12:13-19 ("the number of each type of single-positive droplet may be used … to *calculate* an average level of Target 1 and of Target 2. However, *this estimate* may not be accurate enough if droplets contain multiple target molecules...."); *also compare id.* at 1:42-46 ("the average concentration of analyte in the partitions may be *estimated* from the probability of finding a given number of copies in a partition") *with id.* at 8:56-58 ("The level of each target may be *calculated* based on the respective numbers of partitions positive for each signal alone and signal combination.").

Bio-Rad's construction should be adopted as it most closely follows the express guidance in the specification.

**B.    Disputed Terms in the '154 Patent**

**1.    Whether the "plotting" and "determining" steps must be performed in the order written**

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| Order of performance of "plotting" and "determining" steps" ('154 claim 19) | The steps must be performed in order as written. | Order not required |

The parties dispute whether the "plotting" and "determining" steps must be performed in the order as written (ChromaCode) or not (Bio-Rad). ChromaCode's order requirement should be rejected because the intrinsic record shows that the steps can be performed in any suitable order.

As "a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008). "First, [courts] look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (citation omitted). "If not, [courts] next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Id*. at 1370 (internal quotation and citation omitted). Neither the claim language nor the specification impose such a requirement here.

First, the claim language does not directly or implicitly require that the data must be plotted before the level of the targets are determined. Claim 19 of the '154 Patent recites, *inter alia*:

> A method of performing a multiplexed digital assay, the method comprising:
>
> [a] forming partitions that collectively contain R targets;
>
> [b] amplifying the R targets in the partitions;
>
> [c] collecting data representing amplification of each of the R targets in the partitions…;
>
> [d] plotting the data such that partition populations containing different combinations of the R targets form a rectangular array…; and
>
> [e] determining a respective level of each of the R targets from the data, wherein each level is specific for a single target of the R targets, and wherein the level determined for at least one of the R targets is based in part on a partition count for a partition population

positive for two of the R targets.

'154 Patent, Cl. 19.  The "determining" step (step [e]) as recited in the claim does not refer to any plotted data from the "plotting" step (step [d])—it simply refers to the data that is collected in step [c].  The Federal Circuit has refused to impose an order requirement when "the claim language does not tie these two steps together"—as is the case here.  *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1177 (Fed. Cir. 2022).

In *Sunoco*, the parties disputed whether two recited steps must be performed in the order written in the disputed claim:

> 31. A computer-implemented method for blending a butane stream and a gasoline stream comprising the steps of:
>
> ***receiving a first measurement indicating a vapor pressure of the gasoline stream***;
>
> ***calculating a blend rate at which the butane stream can be blended with the gasoline stream***;
>
> transmitting an instruction to a programmable logic controller for adjusting the butane stream to the calculated blend rate for blending with the gasoline stream and distributing at a rack; and
>
> receiving a second measurement indicating a vapor pressure of the blended gasoline stream and butane stream.

*Id*. at 1176.  The Federal Circuit found no order requirement because (1) "the plain language of the 'receiving' step does not state that the first measurement must be used in the blend-rate calculation," (2) "the 'calculating' step does not specify that the calculation is based on the received first measurement," and (3) it "is a 'comprising' claim and therefore may cover unclaimed elements." *Id.* at 1177.

The structure of claim 19 of the '154 Patent is analogous to structure of the claim in *Sunoco*: (1) the "plotting" step does not state the plotted data must be used in level determination, (2) the "determining" step does not specify that the calculation is based on the plotted data; and (3) it is a "comprising" claim that permits unclaimed elements.  Following *Sunoco*, the claim should not be construed to include an order requirement.

Second, the specification expressly teaches that the steps may be performed in any suitable order.  A POSA would understand that the "plotting" step (step [d]) is related to "Population

Identification" indicated at **50** in Figure 1:



*See* '154 Patent at 9:39-61, Figure 1; *see also infra* Section III.B.2. ("generally parallel"). Likewise, a POSA would understand the "determining" step (step [e]) is indicated at 54 in Figure 1. *See* '154 Patent at 10:57-11:2, Figure 1. As the specification states, "FIG. 1 shows a flowchart of an exemplary method 40 of performing a multiplexed digital assay. The steps presented for method 40 ***may be performed in any suitable order*** and in any suitable combination." *Id*. at 6:20-23.

For example, the specification teaches that in "other cases, only a fraction of the data collected for each set of droplets may be plotted and/or compared, and then additional data collected for the particular set corresponding to the selected annealing temperature may be *plotted and/or analyzed*." *Id*. at 17:8-12. Thus, a POSA would understand that in some cases, certain data can be collected and plotted without being analyzed (*i.e.*, performing step [d] but not step [e]) whereas additional data can be collected and analyzed without plotting (*i.e.*, performing step [e] but not step [d]). Under such circumstances, contrary to the order requirement proposed by ChromaCode, the data collected in step [c] can be used to determine the levels of the targets—as in step [e]—before additional data is collected and plotted for population identification—as in step [d].

### 2. "generally parallel"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "generally parallel" ('154 claim 19) | Indefinite | Plain and ordinary meaning |

ChromaCode contends "generally parallel" is indefinite. ChromaCode's position should be struck because, just like the term "each type of the more than R targets," ChromaCode has failed to disclose this invalidity contention in compliance with the Patent Local Rules. *See* Ex. 1 at 10-13; *see also* Ex. 2 at 9-12; *see also supra* Section III.A.3.a. To the extent the Court nonetheless allows ChromaCode to pursue its untimely challenge, it should again be rejected on the merits because a POSA can ascertain the scope of the claim with reasonable certainty.

Claim "language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention." *Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). For example, "visually negligible" was found not indefinite because the patent specification provided "guidance on how to create visually-negligible indicators" and "specific examples that provide points of comparison for the result." *Id.* at 1379. That is, there existed "an objective baseline through which to interpret the claims." *Id.* at 1378.

While ChromaCode has the burden of proving indefiniteness by clear and convincing evidence, it provides no intrinsic support nor any expert testimony to support its assertion that "generally parallel" is indefinite. *See* Dkt. No. 51 at 9. In fact, the Federal Circuit has construed the exact same term and held it "envisions some amount of deviation from exactly parallel." *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311 (Fed. Cir. 2003); *see also Taction Technlogy, Inc. v. Apple Inc.*, No. 21-CV-812 TWR (JLB), 2022 WL 18781398, at *19 (S.D. Cal. Sept. 28, 2022) (collecting cases that rejected indefiniteness challenges to claim terms of degree, including those that contain the word "generally"). This Court has rejected a similar indefiniteness challenge based on the use of a term of degree—"substantially"—because "the patent claims and specification provide sufficient examples and standards for a POSITA to measure the degree of 'substantially' in the disputed term." *Resh, Inc. v. Robert Conrad, Inc.*, No. 5:22-CV-01427-EJD, 2023 WL 8482869, at *6 (N.D. Cal. Dec. 7, 2023).

Here, ChromaCode's indefiniteness construction should also be rejected because the specification likewise provides ample guidance and examples for a POSA to understand the claim scope.

Specifically, claim 19 of the '154 Patent recites, *inter alia*:

> A method of performing a multiplexed digital assay, the method comprising:
>
> forming partitions that collectively contain R targets;
>
> amplifying the R targets in the partitions;
>
> collecting data representing amplification of each of the R targets in the partitions…
>
> plotting the data such that partition populations containing different combinations of the R targets form a rectangular array, wherein the step of plotting is performed with respect to a pair of orthogonal axes, and wherein each partition population that is positive for only one of the R targets is arranged along a line that is at least ***generally parallel*** to one of the axes; and
>
> determining a respective level of each of the R targets from the data….

'154 Patent, Cl. 19.  Thus, the disputed term relates to data plotting analysis wherein the collected data is plotted in 2-D diagrams and partition populations are assigned based on the position of the data points in the diagrams.  *See, e.g.*, *id.* at 9:49-54.  For example, a data point can be assigned to a partition population that is positive for one of the targets based on the "rows and columns" that are generally parallel to the axes that correspond to specific optical channels.  *See, e.g.*, *id.* at 19:66-20:6.

In the context of the claimed data plotting process, a POSA would understand that "generally" conveys that some deviation from exactly parallel is permitted.  *See United Access*, 757 Fed. Appx. at 969 ("Reasonable certainty does not require absolute or mathematical precision.").  Specifically, the specification discloses methods for assigning data plots to populations that are well known in the art:

> The user then may define the boundary of each population based on the plot(s), e.g., through a graphical user interface to define population boundaries, and/or by inputting values (e.g., representing intensity ranges) to define a boundary for each population. Each population boundary may be defined by one or more ranges of values, a geometrical shape that surrounds the population (e.g., a polygon, ellipse, etc.), or the like.

*See, e.g.*, '154 Patent at 9:54-61.

Further, a POSA would consider the embodiments discussed in Examples 6-7 and depicted

in Figures 12-18 to understand the relative positions of the partition populations. With this guidance, a POSA would be able to ascertain the amount of deviation from exactly parallel that is acceptable to perform the claimed method. For example, Figure 16 shows an embodiment wherein individual droplets are detected in two optical channels and plotted in a 2-D diagram (with a pair of orthogonal axes each representing a channel) in an assay for four targets (RPP30, MP10K, Chr13q3, and Chr10q1):



*See id*. at 4:5-9, Figure 16. As shown above, each of the partition populations are arranged in rows and columns that are ***generally*** parallel to the axes, although not ***exactly*** parallel. Therefore, there is sufficient guidance and examples from the specification for a POSA to measure the degree of "generally" in the disputed term.

For these reasons, the term "generally parallel" is not indefinite and should be construed with its plain and ordinary meaning.

### 3.   "a different plurality of the partitions contains each different pair of the R targets"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "a different plurality of the partitions contains each different pair of the R targets" ('154 claims 6, 15, 23) | Indefinite | Plain and ordinary meaning |

ChromaCode contends "a different plurality of the partitions contains each different pair of the R targets" is indefinite. ChromaCode's position should be struck because, just like the term "each type of the more than R targets," ChromaCode has failed to disclose this invalidity contention

in compliance with the Patent Local Rules.  *See* Ex. 1 at 10-13; *see also* Ex. 2 at 9-12; *see also supra* Section III.A.3.a.

Even to the extent the Court allows ChromaCode's belated challenge, it should be rejected on the merits because a POSA can understand with reasonable certainty the meaning of the term. While ChromaCode has the burden of proving indefiniteness by clear and convincing evidence, it provides no intrinsic support nor any expert testimony to support its assertion that the term is indefinite. *See* Dkt. No. 51 at 8.

A POSA would have understood from the specification with reasonable certainty what "a different plurality of the partitions contains each different pair of the R targets" means.  For example, the specification teaches that partition "populations each positive for a different combination of zero, one, or more of the R targets may be identified, indicated at 50.  In some cases every combination of positives may be identified."  '154 Patent at 9:39-44.  Assays wherein a different plurality of the partitions have each different pair of the R targets are described in Example 6 of the specification, including in the specification's description of Figure 12:

> Eight droplet populations are visible and resolved from each other in FIG. 12, with the droplet populations separated from one another by dashed lines.  The populations are as follows: one triple negative ("empty"), three single positives (each positive for RPP30, 10q1, or 13q3), three double positives *(positive for each pair-wise combination of the targets)*, and one triple positive (positive for all three targets).

*Id*. at 20:26-33.



*Id.*, Figure 12 (annotation added).  In Figure 12 as above, the droplet population in the red circle is positive for targets 13q3 and RRP30, the droplet population in the yellow circle is positive for targets 10q1 and RPP30, and the droplet population in the purple circle is positive for targets 13q3 and 10q1.  Likewise, Figures 13-15 depict results of similar assays for the same targets and Figures

16-18 depict results of assays for four targets in two colors, each depicting a plurality of the partitions that have each different pair of the R targets. *See id.* at 20:45-22:8, Figs. 13-18.

ChromaCode provides no intrinsic support—let alone any expert testimony—to meet its burden to show that the limitation is indefinite by clear and convincing evidence. So, this term should simply be construed according to its plain and ordinary meaning.

### C.    Disputed Terms in both the '128 and '154 Patents

#### 1.    "target[s]"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "target[s]" ('128 claims 1–4, 9–12; '154 claims 1, 6–8, 10–11, 15–16, 19, 23–26) | "any molecule[s] amplified and detected in the assay" | Plain and ordinary meaning |

The parties dispute whether "target[s]" should be given its plain and ordinary meaning (Bio-Rad) or rewritten to include more limitations: "any molecule[s] amplified and detected in the assay" (ChromaCode). ChromaCode's construction should be rejected because it is unsupported by the intrinsic record.

It is a "basic principle of claim construction [] that 'the words of a claim are generally given their ordinary and customary meaning.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. This is one of those cases. "Target" is readily understood by a lay person as well as a POSA to the Asserted Patents, and hence, requires no further construction from its plain and ordinary meaning.

Starting with the claim language, claim 1 of the '128 Patent recites, *inter alia*:

> A method of performing a multiplexed digital amplification assay, [] comprising:
>
> amplifying more than R targets in partitions;
>
> creating R signals representative of light detected in R different wavelength regimes from the partitions…; and

> calculating an average level of each target in the partitions based on the R signals…;
>
> wherein the more than R targets include three targets, and wherein the average levels of the three targets are calculated based on light detected from only two fluorophores associated with probes that bind to amplicons of the three targets during amplification.

'128 Patent, Cl. 1; *see also* '154 Patent. Cl. 1.[3]  A POSA would understand that the claims are directed to methods of investigating target analytes in a sample and that the claimed methods include amplifying the target analytes, detecting signals generated from the analytes, and calculating levels based on the signals.  The term "target" in the claims thus refers to nothing more than an analyte one is detecting, which is simply the plain meaning that would be clear in this context without the need for a further construction.

The patent specifications do not redefine the term or suggest that a construction different from the plain meaning is necessary.  Rather, the specifications use the term in a manner that is consistent with the plain meaning.  *See, e.g.*, '154 Patent at 2:1-3 ("Digital assays frequently rely on amplification of *a nucleic acid target* in partitions to enable detection of a single copy of *an analyte*."), 6:49-50 ("Reagents for reporting may include a different reporter for each *target of interest*."); '128 Patent at 1:60-62, 1:64-66 ("The **target** amplified may be the **analyte** itself or a surrogate for the analyte generated before or after formation of the partitions.").

ChromaCode's construction is unsupported by the intrinsic record.  Particularly, the specification does not provide any lexicography for this term that deviates its meaning from the plain meaning.  *See MasterObjects*, 2024 WL 630330, at *5 ("Absent lexicography or disavowal, we do not depart from the plain meaning of the claims.").  The claim language also does not suggest in the slightest that "targets" must be "**any molecules** amplified and detected in the assay" as proposed by ChromaCode.  Instead, the claims recite amplification, detection, and quantification of "more than R targets in partitions" or "R targets in the partitions," which can cover only a subgroup

---

[3] Claim 1 of the '154 Patent recites, *inter alia*, a "method of performing a multiplexed digital assay, [] comprising: forming partitions that collectively contain R targets; amplifying the R targets in the partitions; collecting data representing amplification of each of the R targets in the partitions…; and determining a respective level of each of the R targets from the data …."

of—not any and all—target molecules amplified and detected in the assay. '128 Patent, Cl. 1; '154 Patent, Cl. 1. ChromaCode's construction, however, suggests that *any and all* molecules amplified and detected in the multiplexed digital amplification assay must be quantified. To the extent this is what ChromaCode intends, there is no basis for such a restriction on claim scope.

"The terms, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims." *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (internal quotation and citation omitted). ChromaCode's construction, however, further adds ambiguity and confusion to the claims. For example, claim 1 of the '128 Patent specifies that among the more than R targets, "the average levels of [] three targets are calculated based on light detected from only two fluorophores." '128 Patent, Cl. 1. Thus, the claim only requires that three targets be quantified based on light detected from two fluorophores and permits *other* targets to be quantified based on *other* decoding schemes (*e.g.*, using three fluorophores). ChromaCode's construction, however, would confuse the jury by altering the claim language to require that the average levels of *any three molecules* amplified and detected in the assay be calculated based on light detected from only two fluorophores. In this regard, ChromaCode's construction should be rejected as it presents potential for misuse. Specifically, ChromaCode's construction could be distorted so as to read out the open-ended nature of the claim language.

### 2.    "each [of]"

| Claim Term | ChromaCode's Proposed Construction | Bio-Rad's Proposed Construction |
|---|---|---|
| "each [of]" ('128 claim 1: from the phrase "calculating an average level of *each* target in the partitions"; '154 claims 1, 11, 19: from the phrase "determining a respective level of *each of* the R targets from the data") | "each and every [one of]" | Plain and ordinary meaning |

The parties dispute whether "each [of]" should be given its plain and ordinary meaning (Bio-Rad) or be limited to "each and every [one of]" (ChromaCode). ChromaCode's construction should be rejected because it is contrary to the specification.

For example, the specification of the '128 Patent states that a "number of partitions that are positive may be determined for each signal…For example, a number of partitions that are positive only for each particular composite signal or corresponding wavelength regime/detection channel may be determined individually (e.g., counted) for each signal or channel (i.e., a number for each channel)." '128 Patent at 8:31-36. In this example, only a certain subset of partitions that are positive for particular composite signals are counted, not "each and every signal." As another example, in the '154 Patent, a "partition count for each partition population may be obtained…. The partition count may be a value…. constituting a particular partition population." '154 Patent at 10:4-7. Again, the specification contemplates analyses that are based not on every single partition population, but only subpopulations.

Because ChromaCode's proposed construction is contrary to the intrinsic record and the word "each" is a plain and ordinary term that even lay people understand, "each" should simply be given its plain and ordinary meaning.

## IV.    CONCLUSION

ChromaCode's proposed construction for each of the disputed terms should be rejected.

Dated:  May 20, 2024

Respectfully submitted

WEIL, GOTSHAL & MANGES, LLP

*/s/ Derek C. Walter*
    Derek C. Walter

EDWARD R. REINES (Bar No. 135960)
DEREK C. WALTER (Bar No. 246322)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel:  (650) 802-3000
Fax:  (650) 802-3100
edward.reines@weil.com
derek.walter@weil.com

*Attorneys for Defendant and Counter-Plaintiff*
BIO RAD LABORATORIES, INC.